GLORIA B. WILLIAMS

V.

DAVID A. GARRAGHTY

Record No. 940727

DAVID A. GARRAGHTY

V.

GLORIA B. WILLIAMS

Record No. 940729

March 3, 1995

Present: All the Justices

226

*Barbara J. Gaden, Assistant Attorney General (James S. Gilmore, III, Attorney General; Guy W. Horsley, Jr., Senior Assistant Attorney General,* on brief), for appellant. (Record No. 940727)

*James B. Thorsen (Thorsen, Page & Marchant*, on brief), for appellee. (Record No. 940727)

*James B. Thorsen (Thorsen, Page & Marchant*, on briefs), for appellant. (Record No. 940729)

*Barbara J. Gaden, Assistant Attorney General (James S. Gilmore, III, Attorney General; Catherine C. Hammond, Deputy Attorney General; Guy W. Horsley, Jr., Senior Assistant Attorney General*, on brief), for appellee. (Record No. 940729)

JUSTICE STEPHENSON delivered the opinion of the Court.

These consolidated appeals from a single judgment present various issues arising out of a plaintiff's recovery of damages in a defamation action.

## I

David A. Garraghty, a prison warden employed by the Virginia Department of Corrections (the Department), sued Gloria B. Williams, a subordinate employee, seeking damages for defamation, insulting words, and intentional and negligent infliction of emotional distress resulting from a memorandum written by Williams. In the memorandum, Williams accused Garraghty of sexual harassment.

Williams filed a demurrer to Garraghty's motion for judgment, contending, *inter alia*, that the statements in the memorandum were constitutionally protected expressions of opinion. In ruling on the demurrer, the trial court rejected Williams' contention that the statements were expressions of opinion and concluded that Garraghty could proceed with his common law defamation claim and his statutory insulting words claim. The court also ruled that Garraghty's damage claim would be limited to "non-personal" damages, *i.e.*, damage to community reputation, lost wages, and financial detriment resulting from injury to occupation. With respect to Garraghty's damage claim for pain and suffering, humiliation and embarrassment, and mental distress, the court ruled that such damages were not recoverable because they were within the exclusive jurisdiction of the Workers' Compensation Act. The court also ruled that Garraghty's claims of intentional and negligent infliction of emotional distress were exclusively within the jurisdiction of the Workers' Compensation Act.

Prior to trial, Williams moved for summary judgment, claiming that her statements in the memorandum were absolutely privileged because the statements were made (a) in the context of her exercise of a federally protected right, or, alternatively, (b) in the course of a judicial proceeding. Williams also reasserted the claim that her statements were constitutionally protected expressions of opinion, incapable of being proved objectively as true or false. The trial court overruled the summary judgment motion.

The case proceeded to trial before a jury on Garraghty's common law defamation and statutory insulting words claims. Following a three-day trial, the jury returned a verdict in Garraghty's favor, awarding him compensatory damages in the amount of $152,597 and punitive damages in the amount of $125,000.

Williams thereafter moved the court to set aside the verdict. Williams argued that Garraghty did not prove that the statements in the memorandum were false or, if false, that she was negligent in making the statements. Williams also claimed that the punitive damages award should be set aside because the record did not disclose clear and convincing evidence that she had acted with actual malice.

The trial court found that the compensatory damages award was supported by the evidence, but that the punitive damages award was excessive. The trial court then required Garraghty to elect whether to accept a new trial or a remittitur of a portion of the punitive damages award. Upon Garraghty's election, under protest, the trial court overruled the motion to set aside the verdict and ordered Garraghty to remit $100,000 of the punitive damages award. The trial court entered judgment on the verdict as modified, and each party appeals therefrom.

## II

The memorandum that is the basis for Garraghty's action was written by Williams on stationery with a Commonwealth of Virginia, Department of Corrections letterhead. At the time, Garraghty was the warden and Williams was the personnel supervisor (also known as the "Human Resource Officer") at the Nottoway Correctional Center. Garraghty discovered the memorandum in an envelope on his office desk.[1]

---

[1] Williams concedes that there was sufficient publication of the contents of the memorandum.

Upon discovering Williams' memorandum, Garraghty called Kern Gillian, the business manager of Nottoway Correctional Center, to his office. Garraghty also called Williams to his office. Garraghty was angry and showed the memorandum to Gillian. When Williams arrived, Garraghty told Williams that he would not allow her to "blackmail this position."

Garraghty then reported the memorandum to the regional administrator, in accordance with Department policy, and requested a full investigation. An investigation was conducted and a report thereof was filed with the director of the Department. Based upon the investigation, the director terminated Garraghty. Subsequently, Garraghty was rehired by the Department at a lower paying position.

An economist testified that Garraghty would suffer $152,597 in lost income over the course of his career as a result of his demotion. This is the precise amount of the compensatory damages that were awarded to Garraghty.

The memorandum alleging sexual harassment by Garraghty reads as follows:

TO: DAVID A. GARRAGHTY, WARDEN

FROM: GLORIA B. WILLIAMS /s/GBW
HUMAN RESOURCE OFFICER

SUBJECT: HARASSMENT

I am requesting a meeting with you to discuss what I perceive to be Sexual Harassment once again. Since 3/17/92, when I brought your paycheck to your house and you made the following remarks:

1. You--"Do you want to mess around?"
   Me --No

2. You--"I guess your husband would kill you if you did."
   Me --Yes

You did discontinue that line of conversation at that point and we finished discussing work and I left your house.

Since that time, once again, I have started getting derogatory notes reference my work and performance from you. You have as yet to speak to me personally reference any problems (just notes).

David, from 1986 - 1988 you and I had a similar problem after I advised you that I was pregnant and getting married. You and I had been seeing each other from 1982 to April 1986. You asked me at that time, why I had not told you about Chuck. Since we had not been seeing each other outside work since April of 86, I did not understand why you felt I needed to discuss Chuck with you. Soon after that, I started getting derogatory notes, and you took my performance from 50 to 28 over the two year period. You had me so stressed out because of your attitude toward me that you caused me to have an angina attack and spend 5 days in the hospital (3 days of this in ICU) and eventually to resign in July of 1989.

It took my going to the hospital for you to stop attacking my work performance and stop sending me derogatory notes, and evaluate me fairly on my performance.

Previously when this all happened, I felt threatened and knew if I made a formal complaint, that I would have to resign. I was not in a position at that point in time financially to do this. However, after the trip to the hospital and near heart attack, at the recommendation of my doctor, I started making plans to resign and relocate.

David, I don't want to have to make a formal complaint now. I'd like to think we can work this out, but I can't deal emotionally with another sparring match with you.

Please advise me of a time that will be convenient to meet [to] discuss this situation.

The evidence regarding the alleged sexual harassment by Garraghty is in sharp conflict. Pursuant to established principles of law, however, we must view the evidence in the light most favorable to Garraghty, the prevailing party at trial.

The first instance of harassment referenced in the memorandum allegedly occurred during an encounter between the parties at Garraghty's home on March 17, 1992. Garraghty was ill, and Williams claims she took Garraghty's pay check to his house in response to his request that "someone" deliver the check. Garraghty testified that he had asked David Robinson, the assistant warden, to deliver the check, but Williams insisted on doing so. When Williams arrived, Garraghty was lying on a sofa. Rather than sitting in a chair, Williams sat on Garraghty. Garraghty emphatically denied that he asked Williams if she wanted to "mess around" or that he said, "I guess your husband would kill you if you did." He did not proposition Williams, and he did not pat her on the knee, as she later claimed.

In the memorandum, Williams next referenced Garraghty's course of conduct after the March 17, 1992 encounter. Garraghty allegedly had written "derogatory notes" regarding Williams' "work and performance" on three interoffice communications.

One communication, titled "Leave Activity Reporting Form," had been filed by Williams on March 20, 1992, to report eight hours of "Other Leave" (OT) that she had taken. On this document, Garraghty had written, "No, I have told you too many times about 8 hrs. of OT and the arbitrary accumulation of OT."

Another communication was an "Interoffice Memorandum" from Brenda Smithson to Williams, dated April 14, 1992, requesting verification that seven named individuals were no longer employees of Nottoway Correctional Center. On this document, Garraghty had written the following note to Williams: "This information should have been sent much earlier than this as per policy."

The third communication was a memorandum from Garraghty to Williams, dated April 21, 1992, which reads as follows:

You have been spending a great deal of time in Richmond lately. Some of these trips are not worth the effort and can be consolidated or canceled.

You were not here on payday due to a meeting. Today you were taking a file down on A. Jones and discussing a check. This could be done by Federal Express, telephone, or runner.

I would suggest you use your time to develop IOPs, long outstanding, for Personnel.

Please advise if you are having problems with control in using your time.

Garraghty denied that any of these notes to Williams were written in retaliation for Williams' alleged refusal of sexual advances by Garraghty. He testified that the notes were prompted by Williams' failure to conform to Department policies.

The last instance of alleged sexual harassment by Garraghty mentioned in the memorandum regards Garraghty's course of conduct from 1986 to 1988. Garraghty allegedly had sent Williams "derogatory notes" and had lowered her performance rating after she had informed Garraghty that she was pregnant and intended to marry a man named "Chuck."

Garraghty denied that he had sent Williams "derogatory notes" during that time period as a result of her conversation with him about her pregnancy and proposed marriage. He conceded, however, that from time to time he sent her "performance problem notes and instructions." Garraghty also denied that he had reduced Williams' performance rating, explaining that, due to a directive from the Governor of Virginia, performance evaluations had been suspended during that period of time.

At trial, evidence was presented showing that Williams had taken excessive leave from work, sometimes without permission. The record also showed that Williams' work performance was poor.

### III

Williams' appeal (Record No. 940727) contains five assignments of error. We will consider them seriatim.

### A

First, Williams claims that the trial court erred in rejecting her argument that her speech contained in the memorandum was constitutionally protected because it was merely an expression of opinion, not of fact. Williams argues that "[b]y its very nature, sexual harassment is in the eye of the beholder." She points to the first sentence in the memorandum where she stated that she "perceives" Garraghty's conduct to be sexual harassment and asserts that "[h]er 'perception' of an inherently subjective concept (harassment) is not capable of being 'proven' as true or false."

■ It is firmly established that pure expressions of opinion are protected by both the First Amendment to the Federal Constitution and Article I, Section 12 of the Constitution of Virginia and, therefore, cannot form the basis of a defamation action. *Chaves* v. *Johnson*, 230 Va. 112, 119, 335 S.E.2d 97, 101-02 (1985). Factual statements made to support or justify an opinion, however, can form the basis of an action for defamation. *See Swengler* v. *ITT Corp.*, 993 F.2d 1063, 1071 (4th Cir. 1993) (construing Virginia law). It is for a court, not a jury, to determine, as a matter of law, whether an alleged defamatory statement is one of fact or of opinion. *Chaves*, 230 Va. at 119, 335 S.E.2d at 102.

■ While Williams' statement regarding her perception may be properly characterized as mere opinion, the statements supporting her opinion are factual in nature. For example, Williams' statements regarding the March 17, 1992 incident at Garraghty's home and the alleged "derogatory notes" sent by Garraghty in retaliation clearly are factual. So, too, are Williams' statements that Garraghty had retaliated against her during 1986-88 by sending other "derogatory notes" and by reducing her performance evaluation. Therefore, the memorandum contains factual statements that can form the basis of a defamation action.

■ Thus, we hold that the trial court did not err in rejecting Williams' argument that her speech was constitutionally protected opinion.

## B

Next, Williams contends that the trial court abused its discretion when it allowed Garraghty to present evidence about Williams' job performance. Williams asserts that this evidence was "collateral to the central issues in the case" and "pure speculation." We do not agree.

■ Generally, evidence that has rational probative value and adds force and effect to other evidence is competent and admissible. A trial court, in the exercise of its discretion, determines whether evidence is competent. *Peacock Buick* v. *Durkin*, 221 Va. 1133, 1136, 277 S.E.2d 225, 227 (1981). Of course, the weight to be given to such evidence is a decision for a jury. *Litchford* v. *Hancock*, 232 Va. 496, 499, 352 S.E.2d 335, 337 (1987).

■ According to Williams' theory of the case, Garraghty's criticism of her work performance was contrived and retaliatory.

Garraghty contended, on the other hand, that Williams' job performance was substandard and that she abused her leave time and workers' compensation time.

We think that evidence tending to support Garraghty's theory had rational probative value and added force and effect to other evidence. Therefore, the trial court did not abuse its discretion in determining that such evidence was competent and admissible, and it was the jury's function to decide from this and other evidence which theory should prevail.

## C

In a third assignment of error, Williams contends that "[t]he trial court erred in granting [Garraghty's] instruction on qualified privilege and rejecting [Williams'] proffered instruction, thereby denying her the qualified privilege to assert a right recognized by federal law to be free from sexual harassment."[2] Instruction No. 12 told the jury that, "[u]nder the circumstances of this case, [Williams'] statement was privileged because she [had] an interest or duty in the subject, and she made the statement to another person with a similar interest or duty." Instruction No. 12 also told the jury that Williams' statement would not be protected if she abused the privilege and further set forth what constituted an abuse of privilege. Williams' proffered instruction would have told the jury that her statement was privileged "because she [had] a right under federal law to be free from sexual harassment and from acts of retaliation for asserting a claim of sexual harassment, and to protect this right by seeking redress from any violation of it." Williams' proffered instruction also added an element of good faith perception regarding what constituted an abuse of privilege.

■ We reject Williams' contention. The present case is not a proceeding brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* This proceeding is a state action for defamation, and Instruction No. 12 was a correct statement of the law. *See, e.g., Smalls* v. *Wright*, 241 Va. 52, 55-56, 399 S.E.2d 805, 807-08 (1991). Moreover, even if the present case were a Title VII proceeding, Williams would not have been immu-

---

[2] On appeal, Williams makes a similar argument based upon the Virginia Human Rights Act, Code § 2.1-714 *et seq.* This contention was neither presented to the trial court nor assigned as error to this Court. Therefore, we will not consider the argument. Rule 5:25; Rule 5:17(c).

nized from a state defamation action. *See Bartulica* v. *Paculdo*, 411 F.Supp. 392, 397 (W.D.Mo., 1976).

## D

In her fourth assignment of error, Williams claims that "[t]he trial court erred in refusing to set aside the jury verdict for compensatory damages." More specifically, she asserts that Garraghty, as a matter of law, did not prove that the contents of the memorandum were false or that Williams was negligent in failing to discover the falsity of the statements.

The trial court properly instructed the jury that Garraghty must prove that the statements that formed the basis of the defamation action were false. The court further instructed the jury that Garraghty also must prove that Williams knew the statements were false or that, believing them to be true, Williams either lacked reasonable grounds for such belief or acted negligently in failing to ascertain the facts upon which the statements were based. *See Ingles* v. *Dively*, 246 Va. 244, 251, 435 S.E.2d 641, 645 (1993).

By its verdict, the jury resolved these issues in Garraghty's favor. Thus, we must determine whether there is evidence to support the jury's decision.

Our standard of review is well settled. When sufficiency of the evidence is an issue on appeal, an appellate court must view the evidence in the light most favorable to the prevailing party at trial. Additionally, a trial court's judgment will not be set aside unless it is plainly wrong or without evidence to support it. Code § 8.01-680.

Garraghty presented evidence that Williams' statements were false. He denied that he had made sexual advances toward Williams on March 17, 1992, or that his notes were written in retaliation of Williams' refusal of any such sexual advances. He also denied that he had sent derogatory and retaliatory notes during the 1986-88 period. He also presented evidence that Williams' job performance had been poor and that she had abused leave privileges.

From the evidence and reasonable inferences deducible therefrom, the jury reasonably could have found that the so-called "derogatory notes" were legitimate criticisms. The jury also could have found that, assuming Williams believed her statements were

true, she lacked reasonable grounds for such belief. Clearly, these issues were for the jury, and the evidence supports its findings.

## E

### 1

In her final assignment of error, Williams contends that the trial court erred in failing to set aside the award of punitive damages. She argues that "the record does not support that Williams' [memorandum] was false and therefore cannot establish that she was negligent in drafting it." Therefore, she asserts, she cannot be charged with having made her allegations with actual malice.

The trial court instructed the jury that it could award Garraghty punitive damages, in addition to compensatory damages, if it believed "by clear and convincing evidence that [Williams] made the statements with actual malice; that is, she knew they were false or she made them so recklessly as to amount to a willful disregard for the truth." This was a correct statement of the law. See, e.g., The Gazette v. Harris, 229 Va. 1, 8, 325 S.E.2d 713, 721, cert. denied, 472 U.S. 1032, cert. denied, 473 U.S. 905 (1985). The jury awarded Garraghty punitive damages in the amount of $125,000.

In returning a verdict in Garraghty's favor, the jury found, based upon the court's instructions regarding privilege, that Williams lost her qualified privilege. The jury had been instructed that Williams' statements were qualifiedly privileged and protected, unless the privilege was abused. The trial court further had instructed the jury that the qualified privilege was abused if Williams "knew the statement was false or made it with reckless disregard of whether it was false or not." Therefore, even before it awarded punitive damages, the jury found by clear and convincing evidence that Williams had made the statements with actual malice.

Notwithstanding the jury's finding, however, we must make an independent review of the record. The Gazette, 229 Va. at 19, 325 S.E.2d at 727. We must decide

whether the evidence in the record on appeal is sufficient to support a finding of New York Times "actual malice" by clear and convincing proof. . . . This does not mean that the reviewing court may disregard the determinations made on

credibility of witnesses by the trier of fact or that the presumption of correctness that attaches to factual findings is to be discounted. . . . The rule simply means that appellate judges in such a case must examine the facts pertinent to the punitive-damage award and exercise independent judgment to "determine whether the record establishes actual malice with convincing clarity."

*Id.* at 19, 325 S.E.2d at 727-28 (citations omitted).

Having made the independent review required by *The Gazette* and given due deference to the trial court's judgment, we conclude that the record supports the finding of actual malice with convincing clarity. Thus, we hold that the trial court did not err in refusing to set aside the punitive damages award.

### 2

The trial court, however, ordered Garraghty to remit $100,000 of the punitive damages award, thereby reducing it to $25,000. Garraghty has assigned error to that ruling (Record No. 940729).

We have not previously stated what standard we should apply in reviewing such a ruling by a trial court. Williams contends that the standard of review should be merely whether the trial court abused its discretion.

We decline to adopt this standard of review in such cases. Instead, we hold that, when a trial court orders or refuses to order a remittitur of punitive damages in a defamation action, we shall make an independent examination of the entire record to determine whether the trial court acted properly. In doing so, we will give substantial weight to the trial court's action and affirm it, unless, from our view of the record, the trial court acted improperly.

The record discloses that Williams' annual salary is $32,000 and that her only substantial asset is her one-half interest in her dwelling, purchased for $29,500 approximately 18 years prior to the trial. The trial court concluded that the jury's award of punitive damages was excessive and could "result in financial ruin to [Williams]." From our independent review of the entire record, we conclude that the trial court acted properly in ordering the remittitur.

IV

A

The final two issues raised are interrelated and arise out of Garraghty's appeal (Record No. 940729). Garraghty contends that the trial court erred in (1) denying his claim for "personal damages"[3] and (2) ruling that his claims of intentional and negligent infliction of emotional distress were within the exclusive jurisdiction of the Workers' Compensation Act (the Act). These rulings by the trial court present a single question, *i.e.*, whether Garraghty's claims of "personal damages" for defamation as well as his emotional distress actions are barred by the exclusive jurisdiction of the Act. The answer to the question turns on whether Garraghty sustained an "injury by accident."

We have defined "injury by accident" within the context of the Act as "an *identifiable incident or sudden precipitating event* [that results] in an *obvious sudden mechanical or structural change in the body.*" *Morris* v. *Morris*, 238 Va. 578, 589, 385 S.E.2d 858, 865 (1989); *accord Middlekauff* v. *Allstate Insurance Co.*, 247 Va. 150, 153, 439 S.E.2d 394, 396 (1994). Also, we recently affirmed the long-standing rule that a gradually incurred injury is not an injury by accident within the meaning of the Act. *Middlekauff*, 247 Va. at 154, 439 S.E.2d at 397 (compiling cases).

Generally, the damages that flow from an action for intentional or negligent infliction of emotional distress are not the result of an injury by accident within the meaning of the Act, but result from a gradually incurred injury. Likewise, the "personal damages" that Garraghty sought to prove as a result of the defamation do not constitute such an injury by accident. We hold, therefore, that the trial court erred in ruling that these claims were within the exclusive jurisdiction of the Act.

B

Finally, on brief, Garraghty "moves this Court to order a new trial on the issue of personal damages only, and a new trial on the issue of intentional infliction of emotional distress and negligent infliction of emotional distress." We cannot order such

---

[3] By "personal damages," the trial court was referring to damages for pain and suffering, humiliation, embarrassment, and mental distress.

piecemeal relief. If a new trial were ordered, it would have to be on all issues, and Garraghty does not request such relief.

## V

■ Accordingly, notwithstanding the error committed by the trial court regarding Garraghty's claims for "personal damages" and for emotional distress, we will affirm the trial court's judgment.

*Affirmed.*

JUSTICE WHITING, concurring in part and dissenting in part.

I agree with the other dissenters that the majority's result is paradoxical; the majority opinion holds that Garraghty was entitled to claim the additional damages denied by the trial court, yet denies him the right to recover those damages on the ground that he cannot have the piecemeal relief he requests in his brief. But I think that the other dissenters' approach is equally paradoxical; although Garraghty has essentially prevailed in these appeals, the other dissenters would take from Garraghty the $177,597 judgment to which all justices agree he would be entitled to, had he not insisted on a new trial.

The majority's solution is to conclude that Garraghty would rather keep his judgment than risk its loss in a new trial, although the majority notes that no such claim was made on brief. However, during oral argument, when presented with the possibility that Garraghty might have to elect whether to take his judgment now or risk the loss of his entire claim in a new trial, Garraghty's counsel responded in pertinent part to the Court's several inquiries:

> Justice, I would say if we had the opportunity, plaintiff, [if] · he had his otherwise [valid] award sustained, would probably look very seriously at whether or not he would want to go through another trial.

. . . .

It may be a double recovery. We may be looking at, say, well, we've got one and the Court may put us to terms, quite frankly.

. . . .

I think, again, the Court could remand it giving the prevailing party the choice whether proceeding it [sic] or stop it at that point, not go forward any further.

I do not think that we have the right to make this election for Garraghty, especially since his counsel asked for that right in oral argument. Accordingly, I would require the exercise of that right before entry of our order. And I would not "throw out the baby with the bathwater," as the other dissenters propose.

JUSTICE KEENAN, with whom JUSTICE LACY joins, concurring in part and dissenting in part.

I disagree only with the remedy devised by the majority. Paradoxically, the majority finds reversible error in the trial court's ruling that the Workers' Compensation Act bars some of Garraghty's tort claims, and yet affirms the trial court's judgment.

I agree with the majority that this Court is unable to award Garraghty piecemeal relief. However, the relief required under these circumstances is a new trial on all issues. In fact, Garraghty conceded at oral argument that the claims he seeks to present on remand would "overlap" with the claims for which the jury has already awarded damages, and could gain him a double recovery. Moreover, Garraghty has not asked to withdraw his request for a new trial on the overlapping claims if this Court should affirm the jury's verdict. Therefore, I would reverse the trial court's judgment and remand these cases for a new trial on the claims raised in both motions for judgment.