Present:  All the Justices

RAYTHEON TECHNICAL SERVICES
COMPANY, ET AL.

v.  Record No. 060400    OPINION BY JUSTICE ELIZABETH B. LACY
                                    March 2, 2007
CYNTHIA HYLAND

                FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                       Arthur B. Vieregg, Jr., Judge

     In this appeal of a defamation case, Raytheon Technical

Services Company (RTSC) and Bryan J. Even ask us to reverse

the judgment of the trial court in favor of plaintiff Cynthia

L. Hyland and enter final judgment on a number of grounds.  In

our review of the case, we agree that the judgment must be

reversed because three of the five alleged defamatory

statements are statements of opinion, not fact, and,

therefore, should not have been submitted to the jury.

Nevertheless, we do not enter final judgment here because the

record does not reflect which statement or statements formed

the basis of the jury verdict and the other grounds for

reversal raised by RTSC and Even are not dispositive in the

posture of this case.

                                FACTS

     In accordance with well-established principles of

appellate review, we consider the evidence and all reasonable

inferences fairly deducible therefrom in the light most

favorable to Hyland, the prevailing party below.  Xspedius

<u>Mgmt. Co. of Va., L.L.C. v. Stephan</u>, 269 Va. 421, 425, 611 S.E.2d 385, 387 (2005). Additionally, we recite only those facts relevant to the issues presented in this appeal.

Hyland was employed by RTSC and its predecessor for approximately 21 years. RTSC is a wholly owned subsidiary of Raytheon Company (Raytheon). Even, the President of RTSC, was Hyland's immediate supervisor at the times relevant here. As part of his management responsibilities, Even conducted annual performance evaluations of Hyland and other RTSC executives.

In 2000, Hyland was the Senior Vice President and General Manager of the Installation and Integration Services (I&IS) division of RTSC. That year, Hyland led I&IS as it competed for a large government contract known as the Technical Support Services Contract (TSSC). I&IS was not successful, and was notified it had lost the contract bid in December 2001. Despite the fact that I&IS had lost the TSSC contract, Hyland received a positive evaluation from Even for 2001.

In February 2002, Hyland's unit submitted a proposal for a contract with the Federal Transportation Security Administration (TSA). In May 2002, I&IS was notified that the contract had been awarded to another company. The following month, Even reorganized RTSC and made Hyland the Senior Vice President and General Manger of a larger business unit called the System and Product Support and Services division (SPSS).

2

SPSS included both the I&IS unit and two additional units not previously under Hyland's management.  At the time of the reorganization, new financial targets were set for the SPSS unit for the remainder of the 2002 calendar year.

As a result of several contract losses, including the TSA and TSSC contracts, RTSC hired a consulting firm to assess RTSC's contract proposals.  The firm prepared a lengthy report focusing on RTSC's performance as an organization and released the report to Raytheon management in August 2002.  The report did not specifically reference Hyland.

In late 2002, RTSC hired another consulting firm, Heidrick & Struggles, Inc., to perform an executive assessment of Even.  As part of this assessment, two Heidrick & Struggles consultants interviewed Hyland on December 6, 2002 regarding her impression of Even's leadership abilities.  The consultants repeatedly assured Hyland that her comments would be completely confidential.  Hyland provided a candid assessment of Even's leadership, which included both positive and negative comments.

On February 13, 2003, Heidrick & Struggles met with Even to give him the results of the assessment.  During that meeting, the consultants provided Even with a "Coaching and Development Feedback Form" which contained both positive and negative assessments of Even's leadership.  The Form stated

3

that there was a significant amount of conflict exhibited by at least one team member, which was impeding the formation of a "high performance" team at RTSC.  Heidrick & Struggles also cautioned "the relationship conflict issue is manifesting into instances of passive-aggressive behavior, which, if left unchecked, could poison the RTSC culture and potentially undermine Even's position as a leader."  The Form suggested that Even "address his team issues immediately and make some tough personnel decisions on the operating side of the business."

Despite Heidrick & Struggles' assurances of "complete confidentiality," the consultants informed Laura B. Miller, the Vice President of Human Resources at RTSC, of Hyland's negative comments regarding Even.  Miller, in turn, shared Hyland's comments with Even.

On February 28, 2003, shortly after Even learned of Hyland's comments to Heidrick & Struggles, Even met with Hyland.  Even warned Hyland the meeting was not "going to be pleasant and it is not going to be easy."  Even used a document entitled "Talking Points – Cynthia Hyland" in his discussion with Hyland.  This document had a section labeled "Examples of talking negatively about leader, peers, other RTN businesses, strategy, etc" and under that heading there was a bullet stating "Feedback from Heidrick & Struggles that she

4

talks negatively to others about BJE." Even admitted that this bullet contained "what Ms. Miller communicated to [him]" regarding the feedback she received from Heidrick & Struggles.

At the meeting, Even also provided Hyland with her 2002 performance and development summary. Although Hyland had never received negative comments about her leadership from Even prior to this meeting, the performance evaluation contained several statements that were critical of Hyland. Even discussed the evaluation, stating that Hyland had been "openly critical of him, [her] peers, Raytheon's vision and strategy, and that this behavior was unbecoming of a leader in the organization." The evaluation further referenced Hyland's "refusal to listen to feedback from customers, the Beacon Group report, and [her] peers, and [Even]." When Hyland pressed Even for examples of the behavior described in the assessment, Even "finally blurted out Heidrick and Struggles told me what you said about me. They said that you made negative and destructive remarks about me and the team." Even told Hyland that he would not hesitate to present the 2002 evaluation to Raytheon's management.

Even and other Raytheon leadership participated in a Human Resources review meeting on May 29, 2003. At the meeting, Even discussed the content of Hyland's 2002 performance evaluation with William H. Swanson, the Chief

5

Executive Officer of Raytheon, and other company executives. On July 3, 2003, Swanson sent Even a memorandum which stated, "We are at the decision point.  If she recognizes her issues and wants to work to improve, let's do everything we can to support her.  If she continues in denial, we'll need to make a change."  Even considered this memorandum to be a "green light" to fire Hyland.

On July 23, 2003, Even and Miller met with Hyland.  Even told Hyland she had refused to accept the feedback he gave her and that this had created a problem with her peers.  He then terminated Hyland's employment.

### PROCEEDINGS

Hyland commenced litigation against Even, Miller, RTSC, Raytheon, and Heidrick & Struggles raising a number of claims.[1] This appeal concerns only her defamation claim against RTSC and Even (collectively "RTSC").  In her second amended motion for judgment, Hyland identified certain statements which she alleged were defamatory.  RTSC filed a demurrer asserting, with regard to the defamation claim, that the alleged statements were not defamatory, did not constitute defamation per se, that certain statements had previously been ruled to

---

[1] Claims of actual fraud, fraud in the inducement, tortious interference with a business expectancy and Hyland's defamation claim against Miller were resolved prior to or during the trial of this case.

be opinion, that others were not actionable opinion, and that still others were not pled with sufficient specificity.[2] Based on the briefs and argument of counsel, the trial court denied RTSC's demurrer to Hyland's defamation count.

After discovery was completed, RTSC filed a motion for summary judgment asserting that, of the allegedly defamatory statements, 1) several were not actionable because they were contained in an initial version of Hyland's 2002 evaluation which only Hyland published; 2) some were true; 3) others were "largely opinion" and even if provably false or true, they were "demonstrably true"; and 4) others were "inactionable opinion." Finally, RTSC asserted that Hyland could not prove that the allegedly defamatory statements were made maliciously, and therefore could not defeat the qualified privilege afforded the statements. After a hearing, the trial court granted in part and denied in part RTSC's motion for summary judgment, limiting Hyland's defamation claim to those allegedly defamatory statements appearing in Hyland's final 2002 evaluation.

During the seven-day jury trial, the trial court denied RTSC's motions to strike and submitted Hyland's defamation

---

[2] RTSC also demurred to two additional statements alleged by Hyland as defamatory. Although these statements were not addressed in the trial court's opinion letter or any ruling in

7

claim to the jury on five allegedly defamatory statements.

Hyland's punitive damage claim based on the alleged defamation

was also submitted to the jury.  The jury returned a verdict

against RTSC and in favor of Hyland and awarded Hyland $1.5

million in compensatory damages and $2.0 million in punitive

damages.  The trial court denied RTSC's post-trial motions to

strike, to set aside the verdict, and for remittitur, but

reduced the punitive damage award to the statutory limit of

$350,000.  Code § 8.01-38.1.  We awarded RTSC an appeal.[3]

## DISCUSSION

### 1.  Defamation Per Se

We first address RTSC's assignment of error which states

that "[t]he trial court erred in ruling as a matter of law

that plaintiff's 2002 performance evaluation was defamatory

*per se*."  (Emphasis added.)  In its ruling on whether the

alleged defamation constituted defamation per se, the trial

court held that "[s]ince the defamatory statements alleged by

Hyland are contained in a report evaluating her performance as

an officer and employee of RTSC, it is plain that false

statements made about her performance may constitute

_____

the record, those statements were not presented to the jury
and we do not consider them in this opinion.

[3] RTSC's original petition for appeal was denied by a
panel of three justices.  This Court granted RTSC's petition
for rehearing but limited the appeal to consideration of
RTSC's first three assignments of error.

defamation *per se* unless they are privileged."  (Emphasis added.)  Neither this ruling nor any other ruling by the trial court held the 2002 performance evaluation of Hyland to be defamatory per se.  Because RTSC's assignment of error does not address any ruling made by the trial court, we will not consider it further.  Rule 5:17(c).

### 2.  Malice

In another assignment of error, RTSC asserts that the evidence was insufficient to meet the clear and convincing standard of malicious publication of the defamatory communications.  RTSC argues that because of this deficiency, no abuse of the privilege was shown and Hyland's defamation claim must fail.  Government Micro Res., Inc. v. Jackson, 271 Va. 29, 43, 624 S.E.2d 63, 71 (2006) (qualified privilege defeated upon showing of malice by clear and convincing evidence).

The jury was instructed that the privilege was abused if Hyland established by clear and convincing evidence any one of a number of circumstances.[4]  As relevant to our discussion

---

[4] Instruction J provided, in relevant part, that "[t]he privilege is abused when the plaintiff proves by clear and convincing evidence that:
(1) the defendant knew the statement was false or made it with reckless disregard of whether it was false or not; or
(2) the statement was deliberately made in such a way that it was heard by persons having no interest or duty in the subject of the statement; or

9

here, one of those circumstances was that "the defendant knew the statement was false or made it with reckless disregard of whether it was false or not." A virtually identical finding was required for the imposition of punitive damages. The jury was instructed that it could award punitive damages if it found by clear and convincing evidence that the statements at issue were made "knowing they were false" or "so recklessly as to amount to a willful disregard for the truth." RTSC has not assigned error to the award of punitive damages and has made no argument before this Court claiming that award should be set aside for insufficient evidence of malice.[5] RTSC's arguments address only the sufficiency of the evidence of malice necessary to defeat the qualified privilege.

We addressed a similar situation in Government Micro Resources, 271 Va. at 43-44, 624 S.E.2d at 70-71. In that defamation case, the defendants assigned error to the award of punitive damages, arguing that the evidence was insufficient to support a finding of actual malice by clear and convincing evidence, and to the failure to instruct the jury on qualified

(3) the statement was unnecessarily insulting; or
(4) the language used was stronger or more violent than was necessary under the circumstances; or
(5) the statement was made because of hatred, ill will, or a desire to hurt the plaintiff rather than as a fair comment on the subject."

privilege.  After determining that the evidence was sufficient to support the punitive damage award, we held that the failure to give a qualified privilege instruction was harmless error because the jury in awarding punitive damages "was required to and did find that the statements were made with actual malice."  Id. at 44, 624 S.E.2d at 71.  Similarly in this case, regardless of RTSC's challenge to the sufficiency of the evidence to establish an abuse of the privilege, the jury found by clear and convincing evidence that the statements at issue were made "knowing they were false" or made "so recklessly as to amount to a willful disregard for the truth" when it awarded punitive damages, and that finding stands unchallenged in this appeal.[6]  Accordingly, we do not further consider this assignment of error.

### 3.  Statements of Fact or Opinion

We now turn to RTSC's remaining assignment of error in which they assert that the trial court erred "in ruling as a

---

[5] RTSC did make this argument before the trial court in its post-trial motion to set aside the verdict, but did not repeat it here.

[6] As discussed infra, RTSC also does not challenge the sufficiency of the evidence supporting the jury finding that Hyland proved, by a preponderance of evidence, that the statements at issue were defamatory.  Under the jury instruction, this finding necessarily included a determination that the statements were false and that Even made the statements knowing they were false or, believing them to be true, he lacked reasonable grounds for such belief or acted

11

matter of law" that the five statements contained in Hyland's 2002 performance evaluation that were submitted to the jury "could form the basis of a defamation action."  Although RTSC argued on brief and in oral argument that the statements were not actionable as defamation because the evidence showed that the statements were true, their assignment of error does not challenge the sufficiency of the evidence.[7]  Furthermore, RTSC did not challenge the sufficiency of the evidence establishing that the statements were false or otherwise not defamatory at trial or in its post-trial motions.  Compare American Commc'ns Network, Inc. v. Williams, 264 Va. 336, 339-41, 568 S.E.2d 683, 685-86 (2002) (statements held not actionable because true where defendants assigned error to sufficiency of evidence that statements were false).  Therefore, in reviewing this assignment of error we consider only the legal question whether the statements are statements of fact or statements of opinion, not whether the evidence was sufficient to show that the statements were true or false or otherwise defamatory.

     In support of their argument that the statements were not actionable opinions, RTSC first asserts that a performance review, by its nature, sets forth the opinions of the

---

negligently in failing to ascertain the facts on which the statements were based.

     [7] None of the assignments of error upon which this Court did not grant an appeal raised this issue.

12

evaluators, implying that such reviews cannot be the subject of a defamation action.  We agree that performance reviews normally will contain the evaluators' opinions, but we disagree with RTSC's suggestion that performance reviews should therefore be immune from claims of defamation.  False statements of fact made maliciously in a performance review remain subject to claims of defamation.  As we stated in Larimore v. Blaylock, 259 Va. 568, 575, 528 S.E.2d 119, 123 (2000),

> The rule of qualified privilege that we adopted years ago continues to encourage open communications on matters of employment while not shielding the use of such communications for an individual's personal malicious purposes.

Turning to the merits of this assignment of error, we first review the principles applied when determining whether statements are opinions or potentially actionable facts. "Statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion." Fuste v. Riverside Healthcare Ass'n, 265 Va. 127, 132, 575 S.E.2d 858, 861 (2003).  Additionally, "[s]peech that does not contain a provably false factual connotation is sometimes referred to as 'pure expressions of opinion.' "  WJLA-TV v. Levin, 264 Va. 140, 156, 564 S.E.2d 383, 392 (2002).  "It is firmly established that pure expressions of opinion are protected by both the First Amendment to the Federal

13

Constitution and Article I, Section 12 of the Constitution of Virginia and, therefore, cannot form the basis of a defamation action."  Williams v. Garraghty, 249 Va. 224, 233, 455 S.E.2d 209, 215 (1995).

While pure expressions of opinion are not actionable, "[f]actual statements made to support or justify an opinion . . . can form the basis of an action for defamation."  Id.; WJLA-TV, 264 Va. at 156, 564 S.E.2d at 393; American Commc'ns Network, 264 Va. at 340, 568 S.E.2d at 686 (quoting Williams, 249 Va. at 233, 455 S.E.2d at 215); see also, Richmond Newspapers, Inc. v. Lipscomb, 234 Va. 277, 298 n.8, 362 S.E.2d 32, 43 n.8 (1987) (finding the trial court was correct to submit opinions "laden with factual content" to the jury in a defamation action); Restatement (Second) of Torts § 566 cmt. a (1977) (false statement of fact "expressly stated or implied from an expression of opinion" subject to defamation under common law).

As the United States Supreme Court noted in Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990), "expressions of 'opinion' may often imply an assertion of objective fact." Id. at 18.  The Supreme Court went on to state, "[s]imply couching . . . statements in terms of opinion does not dispel these implications."  Id. at 19.  Accordingly, the Supreme Court refused to "create a wholesale defamation exemption for

14

anything that might be labeled 'opinion,' " id. at 18, instead holding that opinions may be actionable where they "imply an assertion" of objective fact. See id. at 21.

"Whether an alleged defamatory statement is one of fact or of opinion is a question of law to be resolved by the trial court." WJLA-TV, 264 Va. at 156-57, 564 S.E.2d at 392. In making this determination we do not isolate one portion of the statement at issue from another portion of that statement. See American Commc'ns Network, 264 Va. at 341-42, 568 S.E.2d at 686 (alleged defamatory statements considered "in relationship to the opinions and facts contained in the paragraphs at issue").

Because determination of whether a statement is a statement of fact or opinion is an issue of law, we conduct a de novo review of the five statements in question. Government Micro Res., Inc., 271 Va. at 40, 624 S.E.2d at 69. We reiterate that, in our review of this case, we are not considering whether the statements at issue are true or false; only whether they are capable of being proved true or false.

We will address each of the allegedly defamatory statements sequentially. The first statement is:

> Cynthia and her team met their cash goals, but
> were significantly off plan on all other
> financial targets including Bookings by 25%,
> Sales by 11.5%, and profit by 24%.

15

Whether the business unit missed its goals by the stated

percentages is a fact that may be proved true or false.[8]  The

word "significantly" in the first phrase, in this context, is

defined by the identified percentages and is not merely the

view of the writer.  Accordingly, the trial court properly

determined that this statement could form the basis of a

defamation claim.

The second statement submitted to the jury is also a

statement which contains provably false factual connotations

and is "laden with factual content."  <u>Richmond Newspapers,</u>

<u>Inc.</u>, 234 Va. at 298 n.8, 362 S.E.2d at 43 n.8.  That

statement is:

> Cynthia lead [sic] RTSC in the protest of the
> FAA's evaluation selection process for the TSSC
> contract and through a difficult procurement for
> the TSA, both of which demanded her constant
> attention.  These visible losses created
> significant gaps in our strategic plans and in
> her business unit financial performance.

The negative import of this statement is that Hyland was

responsible for certain losses that adversely affected the

company.  Whether Hyland led the protest of the TSSC contract

award and the TSA procurement and was responsible for "[t]hese

---

[8] The record reflects that RTSC did not assert that this statement was a statement of opinion in motions to strike, demurrer, or motion for summary judgment and there is no record of the hearings on these latter motions; however, the trial court held this statement was factual, not an opinion, in its letter opinion and in denying RTSC's motions to strike.

16

visible losses" is susceptible to empirical proof.  Similarly,

whether losses from those projects created gaps in the

company's plans and the financial performance of business

units which she oversaw can be established through the

production of evidence.  The adjective "significant" may be a

matter of opinion, but the operative part of the statement

involves Hyland's responsibility for the losses, not their

size.  Therefore, the trial court did not err in holding that

this statement was not a statement of opinion and could be the

basis for a claim of defamation.

The third statement, however, should not have been

submitted to the jury as a basis for Hyland's defamation

claim:

> Cynthia is frequently verbose and vocal in her
> opinions, to a degree that others stop
> participating in open dialogue.

The allegedly defamatory aspect of this statement is that

certain conduct by Hyland, her frequent verbosity and vocal

opinions, was negative and led to a specific result, lack of

participation by others in open dialogue.  Whether the result

in fact occurred is only relevant if Hyland's negative conduct

was its cause.  However, the negative conduct, and whether and

how often it occurred, is a matter of the speaker's

perspective and, as such, constitutes opinion, not fact.

Because the negative conduct cited as the reason for others

17

not "participating in open dialogue" is a matter of opinion which is not subject to proof, this statement should not have been submitted to the jury.

Similarly, the fourth statement is also one of opinion:

She has received specific feedback from her customers, the Beacon group study, her employees, and her leader on her need to listen and learn from others, yet she has appeared to be unwilling to accept and work with this feedback.

While evidence could be introduced to establish whether Hyland received certain feedback from the identified entities, the negative impact of this statement is the description of Hyland as unwilling to respond to feedback. Such "unwillingness" is not stated as a fact, but instead is conveyed from the perspective of the writer, stating that Hyland "appeared to be" unresponsive. As such, the statement is opinion not susceptible to proof as a matter of fact.

The final allegedly defamatory statement is:

Cynthia has also been inappropriately and openly critical of her leader, her peers, and other leaders in the company. This behavior is not only destructive to the team, it negatively impacts her image in the eyes of others, including customers.

This statement contains a significant combination of fact and opinion. The negative connotation in the statement is the allegation that Hyland engaged in open and inappropriate criticism of others. The second sentence in the statement

18

could not be true if the alleged conduct did not occur. Whether Hyland's statements are critical of others and made openly are facts that are subject to evidentiary proof; however, whether such statements were inappropriate is clearly a matter of opinion.

In considering the statement as a whole, we conclude that this statement falls into the category of opinion and should not have been submitted to the jury. In order for Hyland's criticism to have the alleged effect, it must be both open and inappropriate. Neither element alone is sufficient. Whether the criticism was inappropriate is a matter of opinion, and accordingly the statement as a whole cannot be subject to evidentiary proof of its truth or falsity. Therefore, the trial court erred in concluding that this statement was a statement of fact and submitting it to the jury.

## CONCLUSION

Although some of the statements at issue were properly submitted to the jury, our conclusion that three of the five statements should not have been submitted requires that the judgment of the trial court be set aside. The jury instructions allowed a verdict in favor of Hyland on any single statement the jury found defamatory. However, the jury instructions did not require the jury to identify which statement or statements it found defamatory. Under these

19

circumstances, the verdict must be set aside and the matter remanded to the trial court for a new trial consistent with this opinion.

<u>Affirmed in part</u>,
<u>reversed in part</u>,
<u>and remanded.</u>